**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 7, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

VAIL ASSOCIATES, INC., and
VAIL TRADEMARKS, INC.,

      Plaintiffs-Appellants,

v.

VEND-TEL-CO., LTD., and
ERIC A. HANSON,

      Defendants-Appellees.

No. 05-1058

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 01-CV-1172-RPM)**

---

Glenn K. Beaton (Stephen C. McKenna with him on the briefs), Gibson, Dunn & Crutcher, L.L.P., Denver, Colorado, for Plaintiffs-Appellants.

Luke Santangelo, Santangelo Law Offices, P.C. (Kay L. Collins, Santangelo Law Offices, P.C., and Thomas R. French, Thomas R. French, P.C., with him on the brief), Fort Collins, Colorado, for Defendants-Appellees.

---

Before **BRISCOE**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

This service mark infringement case is about the use of a purely descriptive term, "Ski," in conjunction with a geographically descriptive term, "Vail," or more precisely, "Ski Vail." Plaintiff Vail Associates (VA), owner of the Vail Ski Resort, has a registered incontestable service mark in the latter, *but not the former* term.[1] VA's service mark registration describes "Vail" as encompassing the gamut of commercial recreational activities and accompanying amenities available in and around the Town of Vail, Colorado, save maybe golf. According to the registration, VA's mark encompasses "downhill skiing facilities, ice skating facilities, cross-country ski trails and expeditions, hiking and back-packing trails, and horseback riding, . . . resort hotel and restaurant services, and retail store services in the field of recreational equipment." United States Patent and Trademark Office (PTO), Reg. No. 1,521,276 (Jan. 17, 1989).[2] Defendant Vend-Tel-Co (VTC) meanwhile has a registered service mark on the vanity or alphanumeric telephone number "1-800-SKI-VAIL," which offers "marketing services related to the ski industry, namely

---

[1] The Trademark Act of 1946, codified at 15 U.S.C. §§ 1051-1127 (as amended) and commonly referred to as the Lanham Act, covers both trade and service marks. See id. § 1053. The Act defines "service mark" as a word or name used "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services." Id. § 1127. The term "trademark" includes a word or name "to identify and distinguish . . . goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods." Id.

[2] VA also holds a symbol mark incorporating the name "Vail." PTO, Reg. No. 848,623 (May 7, 1963). Importantly, that stylized logo, often used in combination with the "Vail" mark, is not at issue here.

2

providing an automated phone switching system to offer services available in or near Vail, Colorado and nearby resort locations."  PTO, Reg. No. 2,458,894 (June 12, 2001).

VA's essential claim is that VTC's use of the geographically descriptive term "Vail" in combination with the descriptive term "Ski" infringes its "Vail" mark, making VTC's use of 1-800-SKI-VAIL violative of the Lanham Act.  Specifically, VA claims direct confusion, that is to say VTC's use of the vanity number is likely to cause consumers to believe that VA or its ski resort is the source of VTC's phone service.  See Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1238 (10th Cir. 2006) (distinguishing direct from indirect confusion).  Consumers, so goes VA's theory of the case, are more likely to dial the number because they perceive it as associated with VA's services.  This, in turn, allows VTC to divert business from VA by referring consumers elsewhere.

## I.

Of course, VA's claim of service mark infringement under 15 U.S.C. § 1114(1)(a), based on the likelihood of confusion between the two marks, is a *factual inquiry* upon which VA bore the burden of proof at trial.  See Universal Money Ctrs., Inc. v. AT&T, 22 F.3d 1527, 1530 (10th Cir. 1994).[3]  Following a

---

[3] Section 1114(a)(1) of the Lanham Act proscribes the unauthorized use in commerce of any reproduction of a registered mark in connection with the marketing of any goods or services where "such use is likely to cause confusion."

(continued...)

3

bench trial, the district court concluded VA failed to meet its burden. Specifically, the district court found VA failed to prove VTC's use of its 1-800 service mark posed a likelihood of consumer confusion between the services offered by VA and VTC. Viewing the evidence in a light most favorable to the district court's finding, our careful review of the trial record reveals ample support for the court's judgment.[4]

See Sanpete Water Conserv. Dist. v. Carbon Water Conserv. Dist., 226 F.3d 1170,

_____

[3](...continued)
While an incontestable service mark is "conclusive evidence . . . of the registrant's exclusive right to use the registered mark in commerce[,]" such evidence "shall be subject to proof of infringement as defined in section 1114." 15 U.S.C. § 1115(b); see KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 117 (2004).

[4] The district court also rejected VA's false designation of origin claim under 15 U.S.C. § 1125(a), and its cancellation claim under 15 U.S.C. § 1064. To establish a false designation of origin claim, a plaintiff must establish such designation "is likely to cause confusion, or to cause mistake, or to deceive." Id. § 1125(a)(1)(A). The district court held VA's claim failed for lack of proof on these elements. Our likelihood of confusion analysis herein necessarily defeats VA's false designation claim. As to its cancellation claim, VA asked the district court to cancel VTC's service mark registration based on two purportedly fraudulent misrepresentations of fact in VTC's 1997 registration application. See id. § 1064(3) (providing for cancellation of a mark if "obtained fraudulently"). On its application, VTC indicated it had employed the 1-800-SKI-VAIL mark from 1992 forward when in fact VTC's predecessor had used the mark from 1992-1997. VTC acquired the mark in 1997. Second, VTC represented it was using the mark as shown in a 1994-1995 advertising directory when, in fact, VTC at the time of the application was no longer using the directory as a method of marketing its product. The district court held VA failed to establish by clear and convincing evidence that these apparent misstatements of fact were material to PTO's issuance of the registration. See Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 942 (10th Cir. 1983) ("Any deliberate attempt to mislead the Patent Office must be established by clear and convincing evidence."). We do not "lightly undertake cancellation on the basis of fraud," id., and are loathe to infer fraud on the basis of the scant record before us.

1178 (10th Cir. 2000) (explaining that on appeal from a bench trial, "we view the evidence in the light most favorable to the district court's ruling and must uphold any district court finding that is permissible in light of the evidence").

On an appeal from a bench trial, we may not set aside the factual findings of the district court "unless clearly erroneous." Fed. R. Civ. P. 52(a). A court bound by the clearly erroneous standard cannot simply reject findings with which it does not agree:

> A finding is clearly erroneous when although there is evidence to support it, the reviewing court *on the entire evidence* is left with the definite and firm conviction that a mistake has been committed. This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. In applying the clearly erroneous standard[,] appellate courts must consistently have in mind that their function is not to decide factual issues de novo.

Estate of Trentadue v. United States, 397 F.3d 840, 859-60 (10th Cir. 2005) (emphasis added) (internal quotations, citations, and ellipses omitted). For reasons to become readily apparent, that standard of review sounds the death knell of VA's Lanham Act claim.

## II.

We begin with a comprehensive appraisal of the trial evidence, viewed through the proper evidentiary prism. That is to say, we review the record evidence in a light most favorable to both the district court's subsidiary and ultimate findings. At the close of VA's case-in-chief, the district court cautiously deferred ruling on VTC's

5

motion for judgment as a matter of law on VA's Lanham Act claim. See Fed. R. Civ. P. 52(c). Yet the court in doing so accurately described VA's claim as "very weak." Appellants' App. at 748 (hereinafter App.).

A.

VA's first witness was Chris Jarnot, Vice-President of Marketing and Sales for VA. After describing VA's corporate structure, Jarnot testified about his "impression" of 1-800-SKI-VAIL: "[T]o me [it] would be confusing to a customer who saw the number. They would perceive it to be our company that were [sic] answering the number." App. at 471-72. On cross examination, Jarnot testified he was not "aware of any instance where consumers were actually confused by the use of 1-800-Ski-Vail." App. at 485. Jarnot further acknowledged "the hundreds of uses of the letters V-A-I-L in the names of businesses in the Vail Valley." App. at 486-87.

VA's next witness was Eric Hanson, a named Defendant along with VTC, and former shareholder and president of VTC. Hanson testified as to the ownership history of 1-800-SKI-VAIL. In 1992, a company known as 1-800-Ski-Numbers, with which Hanson was affiliated, held rights to the number. Hanson stated VTC acquired rights to the number in 1997 and later had the number registered as a mark. VTC transferred ownership of the number to him along with rights to the mark during the pendency of this lawsuit. Throughout the vanity number's history, calls had been routed to various businesses, including at least three travel agencies. At

6

various times, the number was promoted through print directories, print ads, electronic media, and email solicitations. After VA expressed concern about VTC's use of the number in the summer of 1995, callers, at least sporadically, heard a disclaimer stating the number was not affiliated with VA.

On cross examination, Hanson explained 1-800-Ski-Numbers had held the rights to twenty-three vanity numbers all incorporating the word "Ski." The purpose of the company was to use 1-800 numbers as a conduit for pointing consumers to ski-related services in Colorado, among other places. The business plan was to sell advertising as part of print directories and to earn commissions on reservations made through the conduit. Hanson stated that in August 1995, 1-800-Ski-Numbers received a cease and desist letter from VA. The letter stated: "You will not use the expression Ski, or any similar expression together with the word Vail as part of your 800 number advertising or merchandising." App. at 585.

The third, and by far the most telling, witness that VA called to the stand was Joyce Newton. Newton is a resident of the Vail region and the owner of a local travel agency known as Vacation Coordination. In August 2001, Newton's agency agreed to answer calls placed to 1-800-SKI-VAIL. Vacation Coordination began taking calls in September 2001. Newton testified that her agency received "anywhere from ten to twenty calls" per week. App. at 618. The typical caller asked questions "with regard to general ski related products, [or] location questions." App. at 620. Newton stated the caller "would ask perhaps the price of a season pass, [or]

7

directions to get to the Vail destination. There were inquiries about the weather, grooming, just some general location related things. Sometimes it would be about a restaurant or ski rental, or something like that." App. at 621. On cross-examination, Newton responded "yes" when asked whether "it would be fair to say . . . that you get questions all the time in your capacity as a travel agent about grooming and ski passes regardless of whether it was a call from 1-800-Ski-Vail?" App. at 631.

Because Vacation Coordination booked a substantial number of reservations with VA and earned a substantial amount of commissions from those bookings, Newton inevitably became caught in the cross-fire. Mark Manley, VA's Associate General Counsel, delivered to Newton, for her signature, an affidavit to be used in this litigation. The relevant portions of that proposed affidavit read:

> 9. . . . . When Vacation Coordination originally began answering calls to the 1-800- SKI-VAIL telephone number many callers indicated that they thought they were calling the entity that operates the Vail Resort. Individuals would inquire regarding the purchase of ski season passes, ski lift tickets, ski instruction, or in numerous cases, the person asked if they had reached Vail Resorts.

> 10. . . . . Since December of 2001, several callers have still indicated that they were attempting to reach Vail Resorts or were confused that they had not reached Vail Resorts.

Appellees' Supp. App. at 4, 74 (hereinafter Supp. App.).

Newton testified that upon receipt of the affidavit, she made certain additions and deletions, including striking the phrases "many callers," "numerous cases," and

8

"several callers," to more accurately reflect her views.  The deletions (stricken) and additions (italicized) Newton made to paragraphs nine and ten are as follows:

> 9. . . . . ~~When Vacation Coordination originally began answering calls to the 1-800- SKI-VAIL telephone number many callers indicated that they thought they were calling the entity that operates the Vail Resort.~~  Individuals would inquire regarding the purchase of ski season passes, ski lift tickets, ski instruction, ~~or in numerous cases, the person asked if they had reached Vail Resorts~~. *on occasion, however, with no reference to any specific company.  In my opinion, most people can't necessarily identify a specific company with the purchase of their ski vacation products.  They are familiar with [a] <u>place</u> to ski, as a <u>place</u>, not a company.*

> 10. . . . .  ~~Since December of 2001, several callers have still indicated that they were attempting to reach Vail Resorts or were confused that they had not reached Vail Resorts.~~

Supp. App. at 7, 74 (underscore in original).  Newton subsequently told Manley to leave her alone and never delivered her changes to him.  App. at 640.

Troubled by Newton's unwillingness to cooperate, VA ceased doing business with Vacation Coordination.  To restore her travel agency's business relationship with VA, Newton promptly signed a revised affidavit:

> 9. . . . . When Vacation Coordination originally began answering calls to the 1-800-SKI-VAIL telephone number *some callers* indicated that they were calling Vail Mountain or Vail the place to ski.  *Some individuals* would inquire regarding the purchase of season ski passes, ski lift tickets, ski instruction at Vail Mountain or Vail the place to ski.

9

10. . . . . Since December of 2001, *callers have occasionally indicated* that they were attempting to reach Vail Mountain or Vail the place to ski.

Supp. App. at 74 (emphasis added).  Newton testified she "felt coerced" into signing the revised affidavit.  App. at 644; see also App. at 624-46 (detailing the facts surrounding the three versions of the affidavit).

Manley testified next.  Manley stated he was responsible for "policing" VA's registered service mark.  App. at 668.  Like Jarnot, another officer of VA, Manley stated his "impression" of 1-800-SKI-VAIL was that "it would be something that would immediately confuse our customers."  App. at 670.  Manley, on behalf of VA, informally opposed registration of the vanity number with the PTO based on a "concern" that "consumers would see this number published, and would use the number thinking it was going to get them to my company, when it in fact was not." App. at 673.[5]  About the affidavit controversy, Manly testified he did not want Newton to say anything "other than the truth."  App. at 677.  On cross examination, Manley acknowledged both Vail Pass and the Town of Vail were geographic

---

[5]  Manley explained why VA did not formally oppose registration of the 1-800-SKI-VAIL trademark before the PTO:

> An opposition proceeding before the Patent and Trademark Office . . . wouldn't get us to where we wanted.  It could only serve to cancel that particular application.  There's no provision for injunction. [VTC] would be free to continue to use the phone number.  It seemed to me to be an incomplete and inadequate means to deal with this.

App. at 678.

10

locations. Vail Pass was named in 1945 in honor of Charles Vail, a Colorado state engineer. Seventeen years later in 1962, the Vail ski area opened. The Town of Vail was incorporated in 1965. VA registered the word Vail in 1989.

VA's final two witnesses were Gerald Moore and Richard Hansen, respectively. Moore was a shareholder in 1-800-Ski-Numbers between 1992 and 1997. Moore testified the company published two directories, the first during the 1994-1995 ski season and the second during the 1995-1996 season. He also stated that 1-800-SKI-VAIL was first routed to a travel agency in Winter Park, Colorado known as Vacations, Inc. The number was then routed to Vacation Coordination before ultimately ending up with a California company named Ares. Hansen had served previously as President and Chief Executive Officer of 1-800-Ski-Numbers. Hansen stated he and Eric Hanson had been principals in the company. When asked whether he had an opinion about his former business associate's reputation for truthfulness, Hansen stated: "Yes I do. I don't believe he's truthful whatsoever." App. at 744. VTC did not cross examine Moore or Hansen. At that point, VA rested.

B.

Still viewing the evidence in a light most favorable to the district court's ruling, as the law requires us to do, let us assess VTC's case. VTC called only two witnesses. VTC's first witness was Eric Hanson. Hanson stated that VTC was formed in 1986. Its principal business was the installation, maintenance and repair

11

of business phone systems. Hanson explained the history of promotional activities behind the 1-800 numbers included 1-800-SKI-VAIL. He explained that Richard Hansen's early involvement in the 1-800-Ski-Numbers business had ended in litigation. Hanson also testified about his attempts to resolve VTC's differences with VA through numerous means, including his suggestion that VA purchase the vanity number from VTC. A large portion of Hanson's testimony addressed the countless business uses of the word "Vail" in and around the town. Hanson also testified unequivocally that neither he nor any business with which he was affiliated ever intended to confuse consumers or trade on the goodwill of VA. App. at 826-27.

VTC's second and final witness was its expert, Kenneth Germain, from Cincinnati, Ohio. Germain is an attorney practicing in the areas of trademark and unfair competition. He is also an adjunct professor at the University of Cincinnati College of Law. Germain opined that the "Vail" mark might be considered either weak or strong depending upon context:

> In the specific context of ski resort services, the services for which it's registered and for which it's widely known, yes, it's strong, . . . . However, since Vail is inherently a geographically descriptive term in this context, has been forever, or its entire length of usage, I believe, used by third parties for a variety of goods and services related to the Vail, Colorado area, then it is not strong . . . .

App. at 874. Germain also testified as to the similarity of the two marks "with respect to their appearance, sight, sound, and meaning:"

12

Vail is a single word. It is what it is. It's four letters in a certain order, and it has a certain clear meaning in this context. 1-800-Ski-Vail is four components. It's obviously a long distance telephone number. It includes Vail as one component, but it's only one of four. Indeed, it's the last. They're quite different from each other.

App. at 875.

Germain opined that VTC was using the word Vail in 1-800-SKI-VAIL "as a way of telling people that its telephone marketing service relates to Vail, Colorado and environs." App. at 875. Germain's testimony that VTC did not appear to intend to infringe upon VA's mark or utilize VA's reputation was equally critical:

Q. Did you consider any evidence with respect to whether the defendant appeared to be intending to infringe upon, or to utilize the reputation of the plaintiffs in this matter?

A. Well, yes. I didn't see any evidence that indicated an intent to infringe. One doing business in and around Vail, Colorado pretty much has to use the word Vail to get the idea across. So, if one is running a marketing service focusing on activities in and around Vail, Colorado, then one pretty much has to say, to make it completely functional, Vail.

Q. Were there any factors that you considered that seemed to indicate that the defendant did not intend to utilize the plaintiff's – to tie to the plaintiff's reputation?

A. Well, my recollection is that in the materials, advertising materials printed and/or electronic of the defendant, that there were no references to the Vail Resorts, the plaintiff. There were indeed references to other hotels and – it just looked like a potpourri of hotels and other providers of services in and around Vail. I didn't seek any connection to the plaintiff.

Q. Did you consider it significant that the defendant had other 1-800-Ski terms?

A. Yes, it kind of put 1-800-Ski-Vail in context. It was one of some

13

20-odd telephone numbers that all ran the same way, 1-800-Ski someplace, where the someplace was designated by the name, the geographical designation for that place.

App. at 876-77. Finally, VTC asked Germain whether he considered the defendant's use of the term Vail in its 1-800-SKI-VAIL mark "to be a use in good faith." App. at 879. Germain replied: "It looked like a reasonable, competitively necessary thing, and . . . when one adopts . . . as a mark a term which is descriptive, or geographically descriptive in its inception, that party should understand that others will later find . . . the commercial need, to use that term . . . ." App. at 879.

On cross examination, Germain acknowledged again that in the context of ski resort services the commercial strength of Vail as a registered mark "was very strong, probably world renowned." App. at 882. He reiterated, however, that "a term that is as geographically descriptive as Vail is a weak term, and it is a term that members of the commercial public have a right to use." App. at 888. Germain further expressed the view that VTC did not directly compete with VA:

> I think the way I saw it was that they were sort of symbiotic because the defendant's service helps to bring people to the Vail area, and that's probably good for Vail Resorts, the plaintiff, not to the Vail Resort hotel facility per se, but to the ski area, to the mountain, et cetera. There might be a little overlap or a little competitiveness in the sense of [the] hotel . . . .

App. at 882-83.

Germain next indicated consumers were not likely to exercise a high degree of care in calling 1-800-SKI-VAIL: "It's a free line. It's easy. It's quick. But, I

14

. . . assume that they would be careful in committing substantial resources, monetary resources, to ski lift tickets and other things in the area." App. at 883. VA also asked Germain whether he believed VTC had to use the word Ski as part of its mark: "Well, skiing is kind of what people do in Vail. It is the main attraction, except in the summer when it's a nice place to visit. . . . I think skiing of course is a generic term in the area. I mean, it's what one does. So it makes perfect sense to use it." App. at 886-87. After VA passed the witness, VTC rested.[6]

## II.

Taken in a light most favorable to the district court's ruling, the only thing the preceding recitation of the evidence confirms is the district court's finding of no likelihood of confusion was *not* clearly erroneous. Based on our review of the trial record, we are satisfied the district court did not clearly err in finding that *VA failed to prove* the ordinary consumer, looking for winter recreation in and around the Town of Vail, Colorado, associates the word "Vail" exclusively, if at all, with VA or its ski resort. Rather, the ordinary consumer sees Vail as a *place* to ski, *i.e.*, as a ski destination, without associating it with any particular entity or service provider.

---

[6] Before the trial concluded, VA called Mark Manley back to the stand as a rebuttal witness. Manley testified that Vail Sports, Vail Snow Board Supply, Vail Trail, Vail Mountain Lodge and Spa, and Ski Club Vail all use the word Vail as part of their business names with VA's permission. Manley provided no documentary support for his statement. Manley indicated he did not believe other business names incorporating the Vail mark "were being used in a sense that would create confusion." App. at 891.

Simply put, the district court took a permissible view of the evidence to hold VA failed to prove a likelihood of confusion between 1-800-SKI-VAIL and VA's ski resort. As an appellate court, we are not empowered to disturb that view despite what we believe the evidence, properly gathered and presented, might have shown.

A.

Six nonexhaustive factors guide our review of the evidence in evaluating the likelihood of confusion between the two marks: (1) evidence of actual confusion between the marks, (2) the strength of the contesting mark, (3) the intent of the alleged infringer in adopting the contested mark, (4) the degree of similarity between the marks, (5) the similarity of the parties' services and manner in which they market them, and (6) the degree of care consumers are likely to exercise in purchasing those services. See Team Tires Plus, Ltd. v. Tires Plus, Inc., 394 F.3d 831, 833 (10th Cir. 2005). First, let us consider VA's evidence of actual confusion. In Sally Beauty Co. v. Beautyco, Inc., 304 F.3d 964 (10th Cir. 2002), we explained: "Although not necessary to prevail on a trademark infringement case, *evidence of actual confusion in the marketplace may be the best indication of likelihood of confusion*." Id. at 974 (emphasis added).

The record reflects VA offered little evidence of actual confusion, initial interest confusion or otherwise, on the part of consumers phoning 1-800-SKI-VAIL. See Australian Gold, 436 F.3d at 1238 (explaining "[i]nitial interest confusion results

16

when a consumer seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or similar mark"). What little evidence VA did offer the district court understandably discounted. VA and the dissent rely largely on the testimony of travel agent Joyce Newton, owner of Vacation Coordination, to discount the district court's finding that VA failed to prove actual confusion.[7] Newton's testimony was at best mixed. Newton's testimony, *considered in its entirety*, belies any notion the district court's finding of no actual confusion was clearly erroneous. See Universal Money Ctrs., 22 F.3d at 1535 (stating "evidence of some actual confusion does not dictate a finding of likelihood of confusion").

We have detailed both Newton's testimony and the controversy surrounding her affidavit on behalf of VA addressing consumer confusion. Recall that Newton signed a modified version of VA's original affidavit and agreed to testify on behalf of VA *only after* VA cut off her travel agency's ability to book reservations with VA, which, in turn, deprived her travel agency of the ability to earn substantial commissions. The circumstances under which Newton testified cast a cloud upon any portion of her testimony favoring VA. The district court was entitled to consider

---

[7] Regarding the question of confusion, both Chris Jarnot, VA's Vice President of Marketing and Sales, and Mark Manley, VA's Associate General Counsel, testified only to their "impressions" and "concerns." App. at 471-72, 670, 673. Neither witness had any knowledge that consumers *actually* believed they were contacting VA or its properties when dialing 1-800-SKI-VAIL. VA did not call a single consumer witness to the stand.

those circumstances when assessing the credibility of her testimony. See Wessel v. City of Albuquerque, 463 F.3d 1138, 1145 (10th Cir. 2006) (recognizing the "great deference" afforded a district court's credibility determinations).

Newton testified she "felt coerced" into signing an affidavit, which stated "some callers" and "some individuals" when dialing 1-800-SKI-VAIL believed they were calling "Vail Mountain or Vail the place to ski." App. at 644-45. That begs the question: How many are "some?" We have recognized that "'[p]robable confusion cannot be shown by pointing out that at someplace, at sometime, someone made a false identification.'" King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d 1084, 1092 (10th Cir. 1999) (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:14 (4th ed. 1996)). Newton's deletions from VA's original affidavit of the phrases "many callers," "numerous cases," and "several callers" illustrate she was opposed to such representations as simply untrue.[8]

---

[8] That brings us to the question of VA's survey evidence. Evidence of actual confusion is often introduced through the use of surveys, "although their evidentiary value depends on the methodology and questions asked." Sally Beauty, 436 F.3d at 974. Following a *Daubert* hearing, the district court concluded flaws in methodology made VA's survey data and supporting expert testimony unreliable "as a basis for drawing conclusions about confusion or the likelihood of confusion in the relevant market of potential purchasers of the type of services offered by [VA]." App. at 436; see Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1233 (10th Cir. 2004) (explaining that "a trial court's focus generally should not be upon the precise conclusions reached . . . , but on the methodology employed in reaching those conclusions"). We review for an abuse of discretion the manner in which the district court exercises its *Daubert* "gatekeeping" role in deciding whether to admit or exclude survey evidence. See Bitler, 400 F.3d at

(continued...)

18

Of course, Vail is a ski destination. Newton testified that callers, regardless of whether they contacted her agency through 1-800-SKI-VAIL or in some other manner, sometimes inquired about weather, grooming, and ski passes "with no reference to any specific company." App. at 639. That is hardly surprising given a significant number of people travel to Vail to ski during the winter months. Furthermore, Newton specifically stated: "In my opinion, most people can't necessarily identify a specific company with the purchase of their ski vacation products. They are familiar with [a] *place* to ski, as a *place*, not [as] a company." App. at 639 (emphasis added). That too seems unremarkable.[9]

---

[8](...continued)
1232. A careful review of the record in light of the applicable law makes clear the district court most assuredly did not abuse its discretion in excluding from trial VA's survey evidence. See id. ("We will not disturb a district court's [*Daubert*] ruling absent our conviction that it is arbitrary, capricious, whimsical, manifestly unreasonable, or clearly erroneous."). At the hearing, VTC introduced the unrebutted testimony of Daniel Hoffman, a Professor of Marketing at the University of Denver with twenty-two years of marketing research experience. See App. at 308-31. To make a long story short, Hoffman testified that VA's survey suffered from systematic design flaws and utterly failed to comply with generally accepted survey principles. App. at 315, 317-18, 325. The survey suffered from question bias, interviewer bias, location bias, participant bias, and timing bias. App. at 314 (participant/target population bias), 318 (location bias), 319-25 (question bias), 328 (timing bias), 330 (interviewer bias). Hoffman "[a]bsolutely" believed these survey flaws "stack[ed] the deck in favor of [VA's] perspective." App. at 326.

[9] The dissent relies heavily on the fact that consumers who called 1-800-SKI-VAIL asked about "season passes, directions to Vail, weather, grooming, restaurants, and ski rental." Dissent at 12. VA, however, offered not one shred of evidence suggesting that consumers are more likely to call a ski resort than the chamber of commerce, a travel agency, or some other information source to

(continued...)

19

As the dissent recognizes, consumers need not have knowledge of the particular company behind a service source before confusion may occur. Consumers, however, must associate the company's mark with its services. Nothing in Newton's testimony suggests that consumers phoning 1-800-SKI-VAIL routinely, or even more than occasionally, thought they were phoning the service provider represented by the "Vail" mark. That consumers phoning the number sought information about skiing in Vail, Colorado tells us only that those consumers knew they could ski in or near Vail. To reiterate, Vail is a ski destination. Those consumers' anticipated inquiries regarding skiing in Vail tell us nothing about whether those same consumers identified the name "Vail" with the ski resort or the geographic designation.[10] See Thomas J. McCarthy, McCarthy on Trademarks and Unfair Competition § 15:11, at 15-22 (4th ed. 2007) (hereinafter McCarthy) ("[T]he buyer, to be deceived, must be looking for some symbol which he thinks identifies a single, albeit anonymous, source."). That leads us to a discussion of the strength of the "Vail" mark.

---

[9](...continued)
inquire about such matters. In fact, Newton testified that consumers phoning her travel agency directly would ask questions "all the time" about grooming and ticketing. App. at 631. Furthermore, that some callers asked about things not exclusively associated with a ski resort, e.g., directions, restaurants, weather, and rentals, permitted the district court to conclude that those callers believed they were calling a general information number rather than the resort itself.

[10] The dissent's reliance on Newton's testimony that she would frequently redirect calls from 1-800-SKI-VAIL to VA when her travel agency did not offer the service the caller requested or her agency's information about ski conditions was incomplete tells the fact finder absolutely nothing about the subjective belief or knowledge of consumers calling the number. See Dissent at 13.

20

B.

Perhaps the second most important factor for our consideration is the strength of Vail as a service mark. On this point VA fares no better because nothing in the record or applicable law suggests the district court clearly erred in finding the Vail mark is not particularly strong. To be sure, the Vail mark has secondary meaning. See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985) (recognizing a descriptive mark may be registered only upon a showing that the mark has acquired secondary meaning).[11] A likelihood of confusion over a descriptive term can never exist absent secondary meaning. See McCarthy, supra § 14:9, at 14-35. The presence of secondary meaning, however, does not provide the mark holder with an *exclusive* right to use the mark in its original descriptive sense. Secondary meaning provides the mark holder "an exclusive right not in the original, descriptive sense, but only in the secondary one associated with the mark holder's goods." KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 122 (2004).

Both VA and the dissent assert the Vail mark is strong because it has acquired

---

[11] Descriptive terms, including geographically descriptive terms such as "Vail," qualify for registration as trade or service marks only after taking on secondary meaning as "distinctive of the applicant's goods in commerce." 15 U.S.C. § 1052(f). "[P]roof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for five years before the date on which the claim of distinctiveness is made" constitutes prima facie evidence that a mark has acquired secondary meaning. Id.

secondary meaning associated with "world-class ski resort services."[12] Dissent at 23. To illustrate the fallacy of such conclusion, we need only examine the record evidence regarding the strength of the Vail mark's secondary meaning vis-a-vis its primary meaning. "Secondary meaning and likelihood of buyer confusion are separate but related determinations, the relationship rising from the same evidentiary findings. The stronger the evidence of secondary meaning, the stronger the mark, and the more likely is confusion." Levi Strauss & Co. v. Blue Bell, Inc., 632 F.2d 817, 821 (9th Cir. 1980) (Markey, C.J., sitting by designation). *If* VA had introduced convincing evidence that consumers were actually confused by the 1-800-SKI-VAIL mark, then necessarily its Vail mark would have a strong secondary meaning. See McCarthy, supra § 15:11, at 15-21. On the other hand, the fact that VA proved secondary meaning by evidence other than actual confusion "does not necessarily mean that confusion is likely. . . . While evidence of confusion is probative of secondary meaning, *non-confusion evidence of secondary meaning does not necessarily prove likely confusion caused by defendant's use.*" Id. (emphasis added).

In this case, the district court as the trier of fact properly found the Vail mark was not particularly strong because VA's evidence of secondary meaning was not

---

[12] The dissent points out VA presented testimony that Ski Magazine "has ranked Vail the number one ski resort in thirteen of the last seventeen years." Dissent at 23. As yet another example of the ineffective manner in which VA tried this case, VA presented no evidence as to the circulation of Ski Magazine, the regard in which likely consumers of VA's services hold the magazine, or the percentage of those consumers that read the magazine.

22

particularly strong. As previously detailed, the record contains little, if any, evidence that consumers actually confuse 1-800-SKI-VAIL with VA and its ski resort facilities. The registration and incontestability of the Vail mark were VA's primary evidence of secondary meaning. Indeed, one cannot challenge the secondary meaning of an incontestable mark. See Park 'N Fly, 469 U.S. at 191 (holding an incontestable mark may not be challenged on the ground the mark is merely descriptive). Yet "[t]he fact that a trademark is the subject of a federal registration that has ripened into incontestable status should not dictate the conclusion that the mark is strong with no further analysis." McCarthy, supra § 11:82, at 11-166. As the preceding paragraph explains, "non-confusion evidence" of secondary meaning is not particularly forceful when determining the likelihood of confusion.

VA did offer testimony through Chris Jarnot that it spends around $3 million a year promoting the Vail Resort and its ski facilities. But VA was unable to say how much it spent marketing the word Vail apart from its stylized logo. See App. at 492-93; supra n. 2. The district court was certainly entitled to conclude VA spent very little marketing the word Vail apart from its stylized logo. While evidence of a mark's promotion is relevant to prove the strength of a mark, "standing alone without a context such evidence may not be sufficient to prove that a mark is very strong." McCarthy, supra §11:83, at 11-170.

Kenneth Germain, VTC's expert, testified that while the Vail mark was quite strong in the area of ski resort services, the geographically descriptive nature of the

23

mark coupled with its extensive use by third parties substantially undermined its

strength.  App. at 874.  Such a view is consistent with our precedents:

> A strong trademark is one that is rarely used by parties other than the owners of the trademark, while a weak trademark is one that is often used by other parties.  The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion between any two specific goods incorporating the weak mark.

Universal Money Ctrs., 22 F.3d at 1533; accord King of the Mountain Sports, 185

F.3d at 1093.  In other words:  "Use by others of a similar mark will tend to dilute

any consumer recognition and association of that mark with the alleged owner.  Such

use by third parties is therefore relevant to the issue of secondary meaning."

McCarthy, supra § 15:27, at 15-41.  In Universal Money Ctrs., 22 F.3d at 1533-34,

we recognized this very point and quoted with approval the district court's finding

that "the evidence . . . indicates that the term "Universal" is widely used by parties

other than [plaintiff]. . . .  Dun and Bradstreet shows over 200 active businesses

employing the term.  In short, the term is used by a significant number of entities and

is thus a relatively weak mark."

Despite the foregoing analysis, VA and the dissent suggest the word "Vail"

"conjures a mental association with [ski resort] services in buyers' minds."  Dissent

at 25.  Perhaps so, but VA did not prove it.  We find little in the record to support

the view that consumers routinely associate the word "Vail" with VA's ski resort

services.  More importantly, we find no support in the record for the conclusion that

24

the district court's contrary finding was clearly erroneous. The lack of actual confusion evidence, the geographically descriptive nature of the word Vail, and its documented use among numerous businesses in the Vail area, all support the district court's finding that the Vail mark is not particularly strong.

C.

The district court also found nothing in the record to suggest VTC intended to trade on VA's service mark or deceive the public into believing that the operator of the Vail ski facilities provided VTC's marketing service. Once again, the record evidence, properly considered, amply supports the district court's finding. Eric Hanson testified at length that neither he nor any company with which he was affiliated, including VTC or any of its employees, ever intended to derive any benefit from VA's reputation or goodwill. App. at 826-27. The district court certainly was entitled to assess the credibility of Hanson's testimony. This Court is not free to reject that assessment under the clearly erroneous standard. See Salve Regina College v. Russell, 499 U.S. 225, 233 (1991) ("In deference to the unchallenged superiority of the district court's fact finding ability, Rule 52(a) commands that . . . 'due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.'").

Neither, under the applicable review standard, are we free to reject the district court's assessment of the testimony of VTC's expert, Kenneth Germain. Germain testified he found no evidence VTC or Hanson intended to utilize VA's reputation

25

in employing the 1-800-SKI-VAIL mark: "One doing business in and around Vail, Colorado pretty much has to use the word Vail to get the idea across." App. at 876; see Restatement (Third) of Unfair Competition § 14, cmt. d (1995) ("[M]erchants should remain free to indicate their place of business or the origin of their goods [or services] without unnecessary risk of infringement."). Germain further opined that VTC's use of the word ski in connection with Vail made perfect sense: "I think skiing of course is a generic term in the area. I mean it's what one does. So it makes perfect sense to use it."[13] App. at 877.

---

[13] In the course of discounting the testimony of VTC's expert, the dissent asserts he "ignores that when one skis in Vail, one skis at Vail Associates' resort:"

> The expert testified that he was not a skier, that he had only visited Vail in the summer, and the he was not aware whether one could ski in Vail other than through Vail Associates. Conversely, VTC's intent to create confusion was directed at consumers seeking a ski vacation, people who would be far more familiar than VTC's expert with the specific, non-generic meaning created by the combination of the words "ski" and "Vail."

Dissent at 8. The dissent's point is quite appropriate for cross-examination or closing argument. At the appellate stage, however, the dissent's language is nothing short of an improper attack on the expert's credibility and qualification, designed to justify the dissent's skewed view of his testimony, and all the more remarkable because VA did not present the testimony of a single person who had sought a ski vacation at VA's ski resort. We can only reiterate that credibility determinations are for the district court. Furthermore, the rules of evidence "assign to the district court the job of deciding whether an individual is sufficiently qualified to testify as an expert, by virtue of training and experience . . . , subject of course to a tailored review in this court." Watson v. United States, 485 F.3d 1100, 1105 (10th Cir. 2007). VA has not asked us to undertake such a

(continued...)

26

Further commenting on VTC's lack of intent to trade on the good name of VA, Germain explained none of VTC's advertising materials, printed or electronic, referred to VA or its properties. Rather such materials promoted a "potpourri of hotels and other providers of services in and around Vail." App. at 877. Germain also noted VTC's mark was originally part of a portfolio of twenty-plus 1-800 ski numbers containing both the word ski and a geographical designation. Germain thought this significant because the "broader picture" lessened the probability that VTC intended to trade off VA's Vail mark. Consistent with this view, the record reflects the first 1-800 ski number placed in use was not 1-800-SKI-VAIL, but rather 1-800-SKI-ASPEN. App. at 924. During the 1995-1996 ski season, 1-800-SKI-STEAMBOAT, 1-800-SKI-SUMMIT, 1-800-SKI-ASPEN, 1-800-SKI-TAHOE, and 1-800-SKI-VAIL were all up and running. App. at 766.

The dissent's suggestion that the district court clearly erred in refusing to infer a wrongful intent on the part of VTC proves too much. Intent is a question of fact which lies within the purview of the fact finder, in this case, the district court. And the district court, taking a permissible view of the evidence, found VTC, by

_____

[13](...continued)
review in any particularized sense. The entirety of Germain's testimony contradicts the dissent's view that "[b]y incorporating the name of Vail, a major ski resort, into a toll-free telephone number, VTC hoped to capitalize on Vail Resort's reputation as an attractive ski destination." Dissent at 6. Of course, saying the VTC "hoped to capitalize on Vail Resort's reputation" is another way of saying VTC intended to do so.

incorporating the name Vail into a toll-free telephone number, hoped to capitalize, not on Vail Resort's reputation, but rather on Vail, Colorado's reputation as an attractive ski destination. See Baum v. Great Western Cities, Inc., 703 F.2d 1197, 1210-11 (10th Cir. 1977) ("Questions of intent which involve intangible factors, including witness credibility, are matters for consideration of [the] fact finder after a full trial."). In fact, the record reveals VA offered little direct evidence of VTC's wrongful intent. As the foregoing recitation of the evidence well illustrates, the record clearly supports the district court's view that 1-800-SKI-VAIL trades on Vail *as a geographic ski destination*, rather than on Vail as a mark identifying VA and/or its ski resort.

D.

That brings us to the similarity, or, perhaps more accurately, dissimilarity of the marks. The degree of similarity between marks turns upon sight, sound, and meaning. See Sally Beauty, 304 F.3d at 972. The similarity between two marks is an important factor in trademark infringement analysis because one's adoption of a mark similar to a preexisting mark not only bears independently upon the likelihood of confusion, but also may support an inference that one intended to draw upon the reputation of the preexisting mark. See Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 927-28 (10th Cir. 1986) (explaining that intent to draw upon a preexisting mark may be inferred from similarity).

In its opening brief, VA asserts:

28

> 1-800-SKI-VAIL is very similar to the VAIL mark in sight, sound and meaning. Defendants added 1-800-SKI to the Plaintiff's mark, but this hardly alters the conclusion. 1-800 is simply a generic prefix for a toll free telephone number. SKI is not only generic; as used by Defendants it brings to mind the very downhill skiing facilities for which Plaintiff's VAIL mark is world renowned.

VA's position, which the dissent readily accepts, presupposes two critical facts, *neither of which VA offered into evidence*: (1) consumers calling 1-800-SKI-VAIL know that only one ski resort exists in Vail, and (2) those same consumers know the word Vail means that ski resort. A consumer unaware of those particular facts would not likely be confused when phoning 1-800-SKI-VAIL because that consumer could not be confused about facts of which he or she is unaware. In other words, consumers cannot dial an alphanumeric phone number believing it to be associated with VA and/or its ski resort facilities if they have no knowledge of VA's mark in any particularized sense. See McCarthy, supra § 15-11, at 15-23 ("[A] buyer who does not recognize plaintiff's 'mark' and does not distinguish it from any other, cannot be confused."). The record simply does not show the ordinary consumer dialing 1-800-SKI-VAIL possesses such particularized knowledge – knowledge of "secondary meaning" requisite to any resultant confusion between the two marks. By assuming consumers possess such knowledge, the dissent, in effect, proposes to relieve VA of its burden of proof. See Dissent at 5.

Equally troubling is VA's and the dissent's emphatic reliance on the word "ski" to support the conclusion that the two marks are similar. VA has no

29

proprietary rights in the word "ski." VA could have sought service mark protection from PTO for the phrase "Ski Vail," but it did not. VA chose instead to sweep much more broadly, seeking service mark protection only for the word "Vail." VA essentially asks us to grant it a new service mark – "Ski Vail." VA's approach is in tension with binding precedent. In Sally Beauty, 304 F.3d at 973, we explained the district court erred by shortening "Generic Value Products" to simply "Generic" when comparing "aural similarities" with "GENERIX." We wrote: "The district court cited no authority which would permit the shortening of the trademark for likelihood of confusion analysis." Id. So too VA fails to cite any authority for truncating 1-800-SKI-VAIL to simply VAIL and then comparing the two marks. No one part of an alphanumeric mark can take precedence over the other parts of the mark. Id. (explaining that in a word mark, "no one word takes precedence over the others"); see also Universal Money Ctrs, 22 F.3d at 1531 (concluding "AT&T Universal Card" did not sound like "Universal Money," notwithstanding both marks' use of the word "Universal").

Like the aural similarities, the visual similarities between 1-800-SKI-VAIL and Vail are minimal. In Sally Beauty, 304 F.3d at 972, we reasoned: "'Generic Value Products' . . . is not visually similar to 'GENERIX.' [The former mark] consists of three words, while [the latter mark] consists of only one. Although both marks begin with the same six letters, this similarity is not enough to outweigh the visual differences in the marks." In this case, Germain's testimony as to the

30

similarities between the two marks at issue is entirely consistent with our analysis of the marks in <u>Sally Beauty</u>: "Vail is a single word. . . . 1-800-Ski-Vail is four components. It's obviously a long distance telephone number. It includes Vail as one component, but it's only one of four. Indeed, it's the last. They're quite different from each other." App. at 875. Needless to say, the word Vail is not a long distance telephone number. VA's mark does not contain the word ski and contains no numbers or hyphens. In sum, a comparison of the two marks in light of the record evidence and applicable law does not establish that the marks are particularly similar in sound, sight, or meaning.

E.

Considering the nature of the parties' services and the manner in which they market them, the record further belies the notion that VA and VTC compete with each other. VTC's expert, Germain, characterized the parties' relationship as "sort of symbiotic." App. at 882. In other words, both VA and VTC would benefit from a relationship where VTC marketed VA's services. That is because VTC, unlike VA, is *not* in the ski resort business. The services which 1-800-SKI-VAIL provides are at least one step removed from the services VA provides. <u>Compare</u> <u>Beer Nuts</u>, 805 F.3d at 926 (involving two directly competing companies marketing identical goods, sweetened salted peanuts, in the same manner).

As the district court found, 1-800-SKI-VAIL serves as a conduit, much like a travel agency, to bring consumers desirous of visiting Vail and the surrounding

area together with service providers in the region. Apart from the short time that VA ceased doing business with Vacation Coordination on account of the affidavit controversy with Joyce Newton, nothing in the record suggests travel agencies to which 1-800-SKI-VAIL calls were routed were unable to book VA's properties. As VTC's expert explained, VTC's business of bringing consumers to Vail, for the most part, benefitted VA: "[D]efendant's service helps to bring people to the Vail area, and that's probably good for Vail Resorts, . . . not to the Vail Resort hotel facility per se, but to the ski area, to the mountain . . . ." App. at 882. Our standard of review simply does not permit us to discount expert testimony which the district court obviously credited.

The record further reflects that the respective manner in which the parties market their services is not particularly similar. Like each of the six factors, we must consider the similarity between the parties' marketing efforts in light of the overarching purpose of our inquiry – determining whether consumers are *likely to be confused* as to the origin of the service. In this regard, VTC marketing strategy never sought to pass off its services as the same type of high end services VA offered. Rather, radio ads for 1-800-SKI-VAIL billed the number as the "one call . . . to make all of your travel plans." App. at 761-62. The brochures/directories promoting 1-800-SKI-VAIL were telephone directories through which callers could access information about ski conditions, weather, and events, and be connected with area businesses. See App. at 907-22. Viewing the evidence in its entirety, VTC's

32

marketing of 1-800-SKI-VAIL portrayed the number as precisely what it was: an easy-to-use number that connected callers to a variety of services.

At the same time, VA operated under a multi-million dollar marketing budget and marketed its resort services world-wide in a sophisticated manner. VTC was a pauper by comparison, pursuing a cost efficient marketing strategy for 1-800-SKI-VAIL that is entirely different from that employed by VA. For instance, VTC's predecessor, 1-800-Ski-Numbers, at one point advertised its number through print directories listing a "potpourri of hotels and other providers of services in and around Vail." App. at 876. Eric Hanson testified extensively as to the early marketing strategy for 1-800-Ski Numbers. See, e.g., App. 759-70. Due to cost constraints, that strategy never fully came to fruition. The idea that the similarity of the parties' services and the manner in which they market them support a finding of likelihood of confusion is dubious at best. The district court certainly was entitled to find the aforementioned differences outweighed the similarities.

F.

The sixth and final factor bearing upon our likelihood of confusion analysis is the degree of care the consuming public uses in selecting the various services at issue. When consumers exercise a high degree of care in selecting services, the likelihood of confusion shrinks. Sally Beauty, 304 F.3d at 975. Traditionally, our inquiry has focused on "the consumer's degree of care exercised at the time of purchase." Id. (explaining "items purchased on impulse are more likely to be

33

confused than expensive items, which are typically chosen carefully"). But that does not assist VA because its properties provide first class accommodations at first class prices. Ski excursions to Vail, Colorado are not cheap, and consumers undoubtedly choose carefully.

As such, initial interest confusion might lend support to VA's cause. The dissent certainly thinks so. See Dissent at 20-21. Initial interest confusion is a "bait and switch" tactic that permits a competitor to lure consumers away from a service provider by passing off services as those of the provider, notwithstanding that the confusion is dispelled by the time of sale. See Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d 633, 638 (7th Cir. 1999); see also Australian Gold, 436 F.3d at 1238-39. But a court cannot simply assume a likelihood of initial interest confusion, even if it suspects it. The proponent of such a theory must prove it. See McCarthy, supra § 23:6, at 23-30 ("[E]ven if the marks are almost identical, initial interest confusion is not assumed and must be proven by the evidence."). Until then, it remains just a theory. At the risk of sounding repetitive, VA simply failed to prove its theory of the case. We have seen that the evidence of actual initial interest confusion, which VA sought to introduce through Joyce Newton alone, was minimal and highly suspect. Compare Beer Nuts, 805 F.2d at 928 (explaining that a lack of actual confusion evidence is more understandable when the products and services involved are inexpensive because purchasers are less likely to inform the trademark owner when confusion arises over such products and services).

34

Admittedly, consumers exploring ski vacation options will not exercise extraordinary care when dialing a toll-free number. Those same consumers, however, are the very consumers who are unlikely to associate the word "Vail" with VA's ski resort services, thus negating the possibility of any confusion. See supra at 29 ("[C]onsumers cannot dial an alphanumeric phone number believing it to be associated with VA and/or its ski resort facilities if they have no knowledge of VA's mark in any particularized sense."). As for more sophisticated consumers, we doubt whether they would phone 1-800-SKI-VAIL at all. Such consumers would be more apt to contact the Vail Resort directly. But even assuming they phoned 1-800-SKI-VAIL, any initial confusion is unlikely to result in sophisticated consumers booking services elsewhere.

## III.

By now we know the record contains little credible evidence of actual consumer confusion between the alphanumeric number 1-800-SKI-VAIL and the word Vail. We know the evidence has not established VA's Vail mark as particularly strong. We know the record is replete with evidence suggesting that neither VTC nor Hanson ever intended to trade on VA's reputation. We know the sight, sound, and meaning of the two marks are not irrefutably similar. We know VA's and VTC's respective services and the manner in which they market them differ in important respects. We know consumers exercise a high degree of care when planning ski vacations, mitigating confusion that might initially exist between

35

the marks.

Simply stated, *none* of the six *fact-bound* factors we consider in determining the likelihood of confusion, when viewed in light of the record before us, favor VA to any significant degree, if at all.  Thus, the district court's finding that VA failed to prove likelihood of confusion in this case cannot be clearly erroneous.  We refuse, on the basis of the record before us, to deprive VTC of the "ordinary utility of descriptive words."  KP Permanent Make-Up, 543 U.S. at 122.  If some confusion exists, such is the risk VA accepted when it decided to identify its services with a *single word* that is primarily descriptive of a geographic location.  See id.  The law's tolerance of a certain degree of confusion on the part of consumers flows from "the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first."  Id.

We decline to extend unwarranted service mark protection to VA on what the record tells us is first and foremost a geographical term describing a ski destination in the Colorado Rockies.  Such extension would imperil the countless number of retailers, merchants, and innkeepers in and around Vail who use the town's name to promote their wares and services.[14]  In the end, VA's lack of evidence suggesting a

_____

[14]  Indeed, at oral argument, counsel for VA, who no more wanted to talk about the record evidence than a hog wants to talk about bacon, opined that VA would be well within its rights under the Lanham Act to pursue claims of mark infringement against such retailers, merchants, and innkeepers.  According to counsel, VA declined to do so only as a "matter of policy."  The numerous

(continued...)

36

likelihood of confusion could lead one to suspect VA's concern is really about "disconnecting" an alphanumeric phone line which provides easy access to VA's actual service competitors. The record evidence simply belies any notion that VA's Lanham Act claim is about the likelihood of confusion. Rather VA's claim appears more about limiting access to its competition by squelching a conduit which provides easy, free, and readily available access to that competition through use of a vanity or alphanumeric phone number. Because the factual record, viewed in a light most favorable to the district court's judgment, supports the court's finding that VA failed to prove a likelihood of confusion, the district court's judgment is

AFFIRMED.

---

[14](...continued)
businesses in the region using the word Vail as a marketing tool surely find small comfort in such knowledge.

*No. 05-1058, Vail Associates, Inc., and Vail Trademarks, Inc. v. Vend-Tel-Co.,*

*Ltd., and Eric A. Hanson*

**TYMKOVICH**, J., dissenting.


The two marks in this case are confusingly similar. Because the district court erred in its analysis of the *Sally Beauty* factors, I would find in favor of Vail Associates, Inc. and Vail Trademarks, Inc. (together "Vail Associates") on the trademark infringement claim.

Trademark infringement under the Lanham Act results from "[t]he unauthorized use of 'any reproduction, counterfeit, copy, or colorable imitation' of a registered trademark in a way that 'is likely to cause confusion' in the marketplace concerning the source of the different products." *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238 (10th Cir. 2006) (quoting 15 U.S.C. § 1114(1)). This protection against confusion concerning the source of a product or service also extends to confusion with regard to affiliation, connection, association, sponsorship, or approval. Lanham Act § 43(a), 15 U.S.C. § 1125.

I agree with the majority that the district court properly identified the factors relevant to assessing the likelihood of consumer confusion. These factors are (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting the mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks. *Sally Beauty Co. v.*

*Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002). But I conclude the district court erred in its analysis of these factors.

"A finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Naimie v. Cytozyme Lab., Inc.*, 174 F.3d 1104, 1112 (10th Cir. 1999) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 565 (1985)). The assessment for clear error depends on the totality of the record, and the "court's failure to weigh all of the relevant factors in determining likelihood of confusion constitutes reversible error." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 942 (10th Cir. 1983). "At all times . . . the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks." *Team Tires*, 394 F.3d at 833 (internal quotations omitted).

After a thorough review of the record in light of the *Sally Beauty* factors, I am convinced Vail Associates met its burden of proving a likelihood of confusion. Because each *Sally Beauty* factor weighs in favor of Vail Associates, the district court should have found in its favor.

*1. Similarity Between the Marks*

"The degree of similarity between marks rests on sight, sound, and meaning. This court must determine whether the allegedly infringing mark will confuse the public when singly presented . . . ." *Sally Beauty*, 304 F.3d at 972.

-2-

The district court focused on several inquiries related to similarity and decided they weighed in favor of defendants Vend-Tel-Co., Ltd. and Eric A. Hanson (together "VTC"). First, the district court discussed the overall description of the VAIL mark, noting the mark does not exist in isolation but is often accompanied by a unique logo. While the logo is distinctive, in this case that is of little significance because the infringing use is a phone number and Vail Associates alleges infringement of the word mark alone. Second, the district court also noted the parties' marks are visually distinct because phone numbers advertising Vail Associates' products are 1-888 numbers, not 1-800 numbers. I do not consider this a major distinction.

The court's primary conclusion with regard to similarity of sight, sound and meaning found the combination of "ski" and "Vail" was no more infringing than using VAIL by itself. "The word 'ski' is a . . . verb, meaning to glide over snow. . . . The Vail Associates' skiing facilities may be considered unique, but the activity of skiing is not uniquely available at their Vail resorts . . . ." Aplt. App. 445. The district court's analysis of this key factor erred by ignoring the overall meaning of VTC's mark for the consumer. The majority notes Vail Associates' VAIL mark is only one element of four in comparison to VTC's 1-800-SKI-VAIL mark, but we judge the similarity between two marks "by the total impression created by the designations and not by a comparison of the individual features. Although individual features may be dissimilar, the total effect of the two

-3-

designations may be similar." Restatement (Third) of Unfair Competition § 21 cmt. c (1995) [Restatement]. "To the extent that the similarity of mental impression dominates over the dissimilarities in appearance, a likelihood of confusion may result." Restatement § 21 cmt. f.

The other three elements of VTC's mark only serve to emphasize the meaning for which Vail Associates trademarked VAIL. VTC's inclusion of the term "ski" in an alphanumeric telephone number goes to the heart of Vail Associates' business and creates a confusingly similar meaning. Contrary to the district court's finding, the use of the word "ski" in this context does not simply describe the activity of gliding over snow. Instead, the word "ski" sets aside a perception that VTC's services are generically associated with the geographic area of Vail and directly links VTC's business in the consumer's mind to the Vail Resort. Neither does the numerical prefix of VTC's mark distinguish its meaning. The numbers simply indicate to the consumer that the mark is a means of contacting through a toll-free phone number the entity that offers skiing in Vail. Because only one ski resort exists in Vail, a consumer calling VTC can have only one thing in mind: skiing at the Vail Resort.[1]

---

[1] The majority suggests I presuppose critical facts: (1) consumers calling 1-800-SKI-VAIL know that only one ski resort exists in Vail, and (2) those same consumers know the word Vail means that ski resort. But when determining the likelihood of confusion, we consider "the characteristics of the prospective purchasers of the goods or services." Restatement § 21(c). Specifically, we

(continued...)

-4-

Thus the additional elements of the 1-800-SKI-VAIL mark only serve to emphasize to the consumer the importance of VAIL, the portion of the mark that is identical in sight and sound to Vail Associates' mark. The "sight, sound, and meaning" of 1-800-SKI-VAIL strongly suggests to typical consumers that they are accessing the services of Vail Associates.

2. *Intent*

"Proof that a defendant chose a mark with the intent of copying plaintiff's mark, standing alone, may justify an inference of confusing similarity." *Beer Nuts*, 711 F.2d at 941 (internal citations omitted). The key inquiry "is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Jordache Enters. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987) (internal citations omitted). The district court concluded "[t]here is nothing in this record to suggest that [VTC] had the intention of trading on the Vail Associates' trademark or intended to deceive the public into believing that the

---

[1](...continued)
consider "hypothetical purchasers operating in the market context in which the designations are used." Restatement § 20 cmt. g. In the market context at issue, people calling 1-800-SKI-VAIL must be sufficiently interested in skiing to be considering a ski vacation. Not even VTC suggests a typical consumer would call 1-800-SKI-VAIL to organize a spelunking expedition near Colorado Springs, though that is evidently one of the options the 1-800-SKI-VAIL service offered at one time. Given the evidence Vail associates presented—including Vail's prestige in Ski Magazine resort rankings, Vail Associates' extensive marketing efforts, and the acknowledgment by VTC's expert that Vail is a world-renowned ski resort—a typical caller would only dial 1-800-SKI-VAIL because they were interested in skiing at the famous resort called Vail. Aplt. App. 466, 480.

marketing service was provided by Vail Associates or the owners and operators of Vail ski facilities." Aplt. App. 447. The district court erred by failing to infer intent from the similarity of the marks and other evidence.

VTC by its own admission intended to procure telephone numbers that use "the name of a major ski resort or other marketable word." Aplt. App. 924–25. By incorporating the name of Vail, a major ski resort, into a toll-free telephone number, VTC hoped to capitalize on Vail Resort's reputation as an attractive destination and provide people interested in visiting the resort with a means of contacting, not the resort, but businesses affiliated with VTC. "One who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose: that is, that the public will be deceived. All doubts must be resolved against him." *Beer Nuts*, 711 F.3d at 941. VTC clearly desired to trade on the name Vail as a ski destination, an inference supported by their use of a mark already established in the marketplace. *See Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 928 (1986) (holding courts should infer intent from similar marks).

The only doubt about intent VTC raises is that the word "Vail" is a geographic place as well as the name of a famous ski resort. On the record, this doubt must be resolved against VTC because their phone number does not simply use "Vail" as a geographic descriptor. True, the success of VTC's business depended on the ability to inform potential customers that they offered travel

-6-

services for the Vail area.[2] But VTC's use went a step too far by exploiting the combination of "ski" and "Vail" in their alphanumeric number. By doing so, they chose to tie their services to skiing at the Vail Resort.

The majority suggests the district court could have determined Vail Associates presented no evidence of intent based on the testimony of VTC's expert on trademark law, who testified that "ski" and "Vail" are both generic terms, and VTC's use of those terms provides no evidence of an intent to infringe on Vail Associates' mark. The expert testified, "Well, skiing is kind of what people do in Vail. It is the main attraction. . . . I think that skiing of course is a generic term in the area. I mean, it's what one does." Aplt. App. 886–87. The expert's testimony, however, ignores that when one skis in Vail, one skis at Vail Associates' resort. The expert testified that he was not a skier, that he had only visited Vail in the summer, and that he was not aware whether one could ski in

_____

  [2] It is nevertheless worth noting that VTC's use of "Vail" is not like the numerous businesses actually located in Vail that use the word as a descriptor of the business's geographic location. At various times, the 1-800-SKI-VAIL number was routed to travel agencies not in Vail or the Vail Valley, but in Winter Park, Colorado and in California, although the service was also at various times answered by a travel agency in Vail and the Vail Valley Tourism and Convention Bureau. Furthermore, a directory of services offered through 1-800-SKI-VAIL included advertisements for many services far flung from the Vail Valley, including Cave of the Winds, an attraction located near Colorado Springs, Colorado; Ski Sunlight, a ski area in Glenwood Springs, Colorado; and Bighorn Development, a real-estate company in Fort Collins, Colorado. Although the parties do not raise this issue, I note terms that are deceptively misdescriptive of geographic location are not entitled to trademark protection. Lanham Act § 2(e), 15 U.S.C. § 1052(e).

Vail other than through Vail Associates. Conversely, VTC's intent to create confusion was directed at consumers seeking a ski vacation, people who would be far more familiar than VTC's expert with the specific, non-generic meaning created by the combination of the words "ski" and "Vail." *See* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:5 (4th ed. 1996) [McCarthy] ("A potential customer is one who might some day purchase this kind of product or service and pays attention to brands in that market. For example, in a case concerning similar marks used on recreational sailboats, the possible confusion of a person who has no interest in boats at all is not relevant.")

The expert also testified VTC "us[ed the word "Vail"] as a way of telling people that his telephone marketing service relates to Vail, Colorado and environs." Aplt. App. 875. But by adding the word "ski," VTC informed consumers that their service related more specifically to skiing in Vail, not just to general services in the geographic region of Vail. By combining the terms "ski" and "Vail" in a phone number, VTC could only have intended to evoke the particular skiing experience at the only ski resort in Vail and named Vail. VTC confounds the obvious implication of the combined terms.

Furthermore, the record provides additional indications of intent. *First*, VTC attempted to sell the vanity number to Vail Associates, and Hanson testified he thought Vail Associates could increase their revenues by using the number, even though VTC was not able to make profitable use of it. These circumstances

indicate VTC knew the vanity number took advantage of Vail Associates' already established ski resort business.

*Second*, VTC represented in its application to the PTO that the mark was not descriptive but "appears calculated to convey to the average consumer that it is an identifier of a company's services." Aplt. App. 964. But the service the mark most obviously identifies is skiing in Vail. Hanson testified the mark was intended to identify a phone switching service: "We're a conduit. There's callers out over here on this side of the table. We're the conduit through our phone switching system to get to this end over here. . . . What we sell is the conduit here." Aplt. App. 850. But by choosing to identify the "conduit" service with the trademarked word VAIL and the ski activity for which VAIL is trademarked and famous, VTC created the impression of being a conduit to the entity that operates the ski resort at Vail. This, of course, is the source of customer confusion.

*Third*, in a letter to the PTO, VTC compared its mark to 1-800-FLY-SWA (for booking air transportation on Southwest Airlines) and 1-800-PICK-UPS (for scheduling pick-up and delivery of packages by United Parcel Service). The comparisons illustrate VTC's intent because they each identify a general service and the specific provider of the service and provide a contact phone number for that specific provider. Southwest Airlines provides flights. United Parcel Service provides package pick up and delivery. But VTC does not provide skiing. Vail Associates does, and world-famous skiing at that.

Even if VTC's subjective intent was benign, their vanity number, as it is currently used, has an overarching purpose of selling ski packages to Vail. Regardless of subjective intent, VTC directly competes with Vail Associates and capitalizes on the international reputation and marketing Vail Associates creates. *See* 4 McCarthy § 23:105 (noting the modern view that intent "is merely evidence relevant to whether confusion is likely," and "good faith intentions of an infringer are no defense to a finding of liability"). The district court was not free to ignore the objective implication that 1-800-SKI-VAIL directly benefits from the reputation and mystique of the ski resort.[3] VTC is not relying on its own goodwill and reputation; it is taking advantage of Vail Associates' well-known ski resort business.

### 3. *Evidence of Actual Confusion*

"Although not necessary to prevail on a trademark infringement claim, evidence of actual confusion in the marketplace may be the best indication of

---

[3] As evidence that VTC did not intend to trade on Vail Associates' reputation, the district court cited a recorded message callers received at some point during the life of 1-800-SKI-VAIL disclaiming any relationship with Vail Associates. As I note below, the disclaimer does not absolve VTC of any intent to lure customers through initial interest confusion. The majority would further support the district court's finding with (1) Hanson's self-serving testimony that he did not intend the obvious effect of the trademark he chose and (2) VTC's expert testimony that the terms "ski" and "Vail" are generic terms, testimony which ignores the effect of combining the words. This evidence that VTC lacked intent is marginal compared with the strong inference of intent created by VTC's choice of mark. *See Beer Nuts,* 805 F.2d at 928.

likelihood of confusion." *Sally Beauty*, 304 F.3d at 974.  The district court found no such evidence, stating that "[t]he Vail Associates have not provided evidence of actual confusion in that they have not shown that persons calling 1-800-SKI-VAIL assume that they are going to be connected to the owners and operators of Vail ski facilities."  Aplt. App. 446.  Rather, the district court interpreted the evidence as showing "that people calling that number are expecting to be connected to businesses that offer services associated with skiing in the Vail Valley area."  Aplt. App. 446.  The district court erred with this interpretation of Vail Associates' evidence.

At trial, Vail Associates offered the testimony of a travel consultant, Joyce Newton, who answered calls to the 1-800 number.  She testified that, on a weekly basis, her company answered ten to twenty calls to 1-800-SKI-VAIL, and that these callers fit a very different profile than the callers who responded to her travel agency's marketing.  She stated that "*more often than not*, there were questions with regard to general ski related products, location questions."[4]  Aplt.

---

[4]  The majority suggests the district court did not clearly err in finding no evidence of actual confusion because "[p]robable confusion cannot be shown by pointing out that at someplace, at sometime, someone made a false identification." Op. 18 (citing *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092 (10th Cir. 1999) and 4 McCarthy § 23:14).  The evidence, however, shows the majority of ten to twenty callers each week to 1-800-SKI-VAIL were specifically seeking information about skiing at Vail Resort.  "Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one

(continued...)

-11-

App. 620 (emphasis added). She testified these questions included information about season passes, directions to Vail, weather, grooming, restaurants, and ski rental.

These questions directly relate to services provided by Vail Associates, not simply generically, as the district court found, to "businesses that offer services associated with skiing in the Vail Valley area." In fact, when Newton's business did not offer the service the caller was seeking, her agents directed the caller to Vail Associates, because these inquiries were not "a revenue product for us." Aplt. App. 621. When a caller asked about grooming at Vail Ski Resort, Newton testified, "we would refer to one of the Vail Resort switchboards and just let them go ahead and route to the correct area." Aplt. App. 621. When callers asked about season passes to Vail, which "happened quite often," Newton's agents would redirect the call to Vail Resorts. Aplt. App. 622. Newton acknowledged only Vail Resorts provides season passes. This testimony shows callers contacted 1-800-SKI-VAIL seeking information from the operator of Vail Resort.[5]

----

[4](...continued)
can make an informed decision as to the weight to be given the evidence."
4 McCarthy § 23:14. Newton was receiving only ten to twenty calls a week on the 1-800-SKI-VAIL line, and she testified the number was not being advertised, so the opportunities for confusion were relatively few. That ten to twenty callers per week dialed the 1-800-SKI-VAIL and the majority of those callers specifically asked questions directed at Vail Associates' ski resort business is significant evidence of actual confusion.

[5] The majority makes much of the changes Newton made to an affidavit
(continued...)

-12-

Newton did testify on cross-examination that she frequently gets questions as a travel agent from clients about grooming and ski passes because of her business's geographical location. But she also testified that callers to her travel agency asked such questions as a "question in a series of . . . appropriate questions for our company and our product," Aplt. App. 646, and that such questions were a "secondary or subsidiary type of question when getting into some atmospherically specific things about their vacation." Aplt. App. 650.

---

[5](...continued)
prepared for her by a representative of Vail Associates. Newton in essence revised the affidavit to indicate that callers did not directly communicate to her that they were trying to reach Vail Associates. Newton added to her affidavit, "In my opinion, most people can't necessarily identify a specific company with the purchase of their ski vacation products. They are familiar with [a] place to ski, as a place, not a company." Supp. App. 74.

But to show evidence of actual confusion, Vail Associates does not need to show callers were trying to reach a particular company. Rather, Vail Associates must demonstrate callers were trying to reach a particular source of services.

> Although trademarks serve to identify goods or services that share a common source or sponsor, the identity of the source or sponsor may remain anonymous. It is universally recognized that a likelihood of confusion sufficient to establish infringement may exist regardless of whether prospective purchasers know the specific identity of the trademark owner.

Restatement § 20 cmt. d.

The calls Newton received, including calls requesting season passes and grooming reports, demonstrate that callers were attempting to contact the only place for skiing in Vail, a resort operation that happens to be run by Vail Associates. That callers did not or could not specifically identify an entity they were attempting to contact is immaterial to the evidence of actual confusion.

-13-

Based on this testimony, the district court explains the calls to 1-800-SKI-VAIL requesting specific information about services provided by Vail Associates by concluding callers would ask these questions simply because they thought they were contacting some non-specific business geographically located in Vail. But people do not just call any business in Vail, even a travel agency, to obtain season pass, weather, and grooming information. Newton testified there was a "substantial" difference between the general information questions her travel agency customers asked and the questions callers to 1-800-SKI-VAIL asked. On the 1-800-SKI-VAIL line, "it had nothing to do with their vacation. It was directly about the grooming or the season passes. . . . That was all. That was their specific line of questioning." Aplt. App. 650–51. People primarily seeking specific information about ski conditions or tickets would naturally try to call the ski resort. This is what callers to 1-800-SKI-VAIL did.

The district court addressed Newton's testimony as indicating only "that requests for ski passes, lift tickets and other services provided by the plaintiffs were routed to the plaintiffs and there is nothing to indicate that any other responders to the number were diverted from the plaintiffs to competitive providers."[6] Aplt. App. 447. But the record directly contradicts the court's finding that callers were not diverted to competitive providers. Evidence of

---

[6] This statement conflicts with the district court's finding that there was no evidence of actual confusion.

-14-

actual confusion can include initial interest confusion, which results when a prospective consumer of one product is lured to a competing product by a similar trademark. *See Australian Gold*, 436 F.3d at 1238. "Even though the consumer eventually may realize that the product is not the one originally sought, he or she may stay with the competitor. In that way, the competitor has captured the trademark holder's potential visitors or customers." *Australian Gold*, 436 F.3d at 1238–39.

Newton testified that "on occasion, [callers to 1-800-SKI-VAIL] suited our marketing plan" for travel services, including lodging. Aplt. App. 620. She also testified that her company booked rooms and properties not affiliated with Vail Associates. As Newton's testimony shows, even if callers were referred to Vail Associates for ski conditions or pass information, those callers who sought accommodation packages were not. Because a significant aspect of Vail Associates' ski business is hotel and condominium packages, 1-800-SKI-VAIL competed directly with Vail Associates in this regard, and Vail Associates presented evidence that consumers who were trying to contact the operator of Vail Resort and who were seeking accommodations were instead diverted to competitors.[7]

---

[7] The majority acknowledges that 1-800-SKI-VAIL "provides easy access to [Vail Associates'] actual service competitors." Op. 36.

The record thus shows that the district court ignored evidence indicating consumers called 1-800-SKI-VAIL attempting to contact the operator of Vail Ski Resort and that callers seeking accommodation packages were diverted to Vail Associates' competitors. While Newton did not receive a large volume of calls to the 1-800-SKI-VAIL number, she testified that "more often than not" those callers were seeking information that would normally be provided by the operator of Vail Ski Resort. Accordingly, the district court's finding that Vail Associates presented no evidence of actual confusion was erroneous.

*4. Similarity of the Products and Manner of Marketing*

The district court found the use of the 1-800-SKI-VAIL is limited to "marketing services providing a conduit between the caller and providers of lodging, restaurants, and other business services associated with skiing in the Vail area. There is nothing in that use to suggest that this is a service provided by the owners and operators of the Vail ski facilities." Aplt. App. 446. This finding ignores the overlapping nature of the parties' businesses and fails to acknowledge that the parties appeal to exactly the same class of consumers.

Naturally, "[c]onfusing similarity is most likely when the products themselves are very similar." *Beer Nuts*, 711 F.2d at 941 (internal quotations and citations omitted); *see Universal Money Ctrs. v. AT&T*, 22 F.3d 1527, 1532 (10th Cir. 1994) ("The greater the similarity between the products and services, the greater the likelihood of confusion."). VTC's marketing of a phone number does

-16-

not mean they were marketing a different service than Vail Associates. VTC held out 1-800-SKI-VAIL as a means of accessing the same ski resort services offered by Vail Associates. In its current use as a telephone connection to a travel agency, 1-800-SKI-VAIL competes with Vail Associates' ski resort lodging business and potentially disparages the quality of accommodations Vail Associates offers. VTC's own expert acknowledged that 1-800-SKI-VAIL competes with Vail Associates' ski resort lodging.[8]

The district court also erred by failing to acknowledge that the parties appeal to the same class of consumers—people seeking a ski vacation in Vail. "If similar marks are used on goods or services that are marketed to the same prospective purchasers, the likelihood of confusion is greater than if there are few common purchasers." Restatement § 21 cmt. g; *see Dieter v. B&H Indus., Inc.*, 880 F.2d 322, 327 (11th Cir. 1989) (finding likelihood of confusion when customers were similar but marketing strategies were dissimilar); *cf.*

---

[8] The history of 1-800-SKI-VAIL also indicates that VTC's relationship with Vail Associates may have been less than "symbiotic," as VTC's expert testified. Aplt. App. 882. Certainly, people calling 1-800-SKI-VAIL are predisposed to visit the area and ski at the Vail resort, but the service could draw people to competing areas as well. First, as a connection to a travel agency, 1-800-SKI-VAIL offers travel services outside the Vail area; second, the phone number's initial incarnation as a directory service competed with Vail Associates not only on lodging, but the printed 1-800-SKI-VAIL directory included an advertisement for a competing ski resort; and third, callers at one point could also access, among other things, information on Cave of the Winds, an attraction near Colorado Springs that would take callers away from the Vail area entirely.

*Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557 (10th Cir. 1998) (concluding there was little likelihood of confusion when the parties "operate[d] in distinctly different markets, [sold] distinctly different products, and contact[ed], for the most part, very different people in their marketing efforts"). Given the similarity of the marks, the congruency of the target audience in this case strongly indicates a likelihood of confusion.

Because VTC markets an overlapping product to the same pool of consumers as Vail Associates, VTC's use of a mark virtually identical to Vail Associates' can only suggest to the typical consumer that 1-800-SKI-VAIL is affiliated with Vail Associates' ski resort business. By "promot[ing] the alphanumeric translation of [a] phone number, [VTC] caus[ed] the public to see the protected mark and associate the infringer's goods or services with those of the mark holder." *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 939 (8th Cir. 2003); *see also Holiday Inns v. 800 Reservation*, 86 F.3d 619 (6th Cir. 1996). VTC used the phone number to create an association in consumers' minds with the famous ski resort and then sold consumers services in competition with that resort.

### 5. *Degree of Care Likely to be Exercised by Purchasers*

The consumer's sophistication or degree of care is relevant because we assume a sophisticated consumer exercising a high degree of care at the time of a product's purchase is less likely to be confused. *Sally Beauty*, 304 F.3d at 975.

-18-

Although VTC concedes the district court did not expressly consider this factor, they argue this factor is not critical because we are concerned only with the degree of care at the time of purchase, and a customer purchases a package from 1-800-SKI-VAIL only after hearing a message disclaiming any affiliation with Vail Associates. VTC's argument is unpersuasive because the disclaimer does not alleviate the confusion problem, even among sophisticated consumers.

Our cases have recognized that consumers purchasing higher cost items are likely to exercise more care, and a ski vacation is an expensive luxury item many consumers will plan carefully. *See Sally Beauty*, 304 F.3d at 975; *Beer Nuts*, 711 F.2d at 941. Nonetheless, people simply exploring ski vacation options will not exercise such extraordinary care when simply dialing a toll-free number, as VTC's expert testified. VTC's service therefore attracts consumers at both ends of the degree of care spectrum. But all potential customers, no matter the degree of care being exercised, may experience initial interest confusion if the consumer "seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or a similar mark." *Australian Gold*, 436 F.3d at 1238. Even though initial confusion is dispelled, the consumer may stay with the competitor.

A disclaimer does not alleviate the damage wrought by initial interest confusion. *See id.* at 1240 (applying this principle to web sites). Here, a typical consumer seeking a ski vacation in Vail is likely to call 1-800-SKI-VAIL seeking

-19-

information, accommodations, or a complete ski package. Whether the caller is an unsophisticated consumer simply gathering information or a sophisticated consumer who is ready to book an expensive ski vacation, VTC has obtained a major advantage over Vail Associates in selling its accommodation services if the consumer dials 1-800-SKI-VAIL hoping to contact the operator of Vail Resort, disclaimer notwithstanding. Vail Associates will never see those consumers who thought they were calling the resort or were interested in a complete package of lift tickets and accommodations offered by Vail Associates.

6. *Strength of the Mark*

Finally, I consider the strength of VAIL as a word mark. Trademarks are categorized according to their relative strength. The stronger the mark, the more likely the confusion. *Sally Beauty*, 304 F.3d at 975. In ascending order of strength, the categories are: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *Id.*[9] A "descriptive mark identifies a characteristic or

---

[9] Generic marks refer to "a general class of goods, such as 'cola,' of which an individual article is but a member." *Sally Beauty*, 304 F.3d at 976. Because a generic mark does not specify the origin of a product, it is not entitled to trademark protection. Unlike generic and descriptive marks, suggestive, fanciful, and arbitrary marks are inherently distinctive and therefore do not need proof of secondary meaning. Suggestive marks do not directly describe a product, but instead suggest a product, requiring "the consumer to use imagination and perception to determine the product's nature." *Id.* Arbitrary marks are similar, using only "common words, symbols, and pictures that do not suggest or describe any quality or characteristic of the goods or services." *Id.* Fanciful marks are words coined for the express purpose of acting as a trademark. *Id.*

-20-

quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Id.* at 976.

VAIL is a descriptive mark because it also refers to the geographic location of the Town of Vail and the Vail Valley region west of Vail Pass. Accordingly, its strength depends on whether it has acquired a secondary meaning distinctive of the location. *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004); *see also* 2 McCarthy § 14:1 (noting that "descriptive geographical terms are in the 'public domain' in the sense that every seller should have the right to inform customers of the geographical origin of his goods. Therefore, a seller must build up goodwill and consumer recognition in a descriptive geographical term in order to have a legally protectable interest, and take the term out of the public domain").

"Secondary meaning exists only if most consumers have come to think of the word as not descriptive at all but as the name of the product [or service]." *Donchez*, 392 F.3d at 1218; *see Retail Servs. v. Freebies Publ'g*, 364 F.3d 535, 539 (4th Cir. 2004) ("Saying that a trademark has acquired 'secondary meaning' is shorthand for saying that a descriptive mark has become sufficiently distinctive to establish 'a *mental association* in buyers' minds between the alleged mark and a single source of the product.'") (quoting 2 McCarthy § 15:5) (emphasis in original). A geographically descriptive term, like all other descriptive terms, acquires a secondary meaning when prospective purchasers come to associate the

-21-

term with a particular source, even if the purchaser cannot identify that source. Restatement § 13 cmt. e. Thus, a consumer need not recognize that a particular company, or any company at all, operates the ski runs at Vail; a consumer need only associate VAIL with that particular skiing experience.

Here, the district court found that "[a]s an identifier of the services for which [VAIL] was registered, the word mark is weak and is more descriptive of a geographical location at which those services are provided rather than for the services themselves." Aplt. App. 446. The evidence does not support this conclusion. VAIL is a descriptive term that has acquired a secondary meaning—world-class ski resort services. VTC's own expert testified VAIL is a strong mark "[i]n the specific context of ski resort services, the services for which it's registered and for which it's widely known." Aplt. App. 874. The expert later testified the commercial strength of the VAIL mark is "probably world renowned." Aplt. App. 882. Vail Associates presented testimony that Ski Magazine has ranked Vail the number one ski resort in thirteen of the last seventeen years. This renown is backed by substantial marketing efforts: $13 million in 2003, and over $100 million since the VAIL mark was registered in 1989.[10]

---

[10] Vail Associates spent $10 million in 2003 marketing Vail Mountain in conjunction with its other resorts and $3 million marketing Vail in isolation. The majority and the district court discount Vail Associates' efforts to promote its

(continued...)

Of course the context of ski resort services for which Vail Associates has invested in its world-renowned mark is the very context in which VTC used the VAIL mark—they inserted the word "Vail" into a phone number associated with skiing. This is not a case, like the expert described, of "Ford taken out of . . . the automotive context, Ford bubble gum, Ford modelling [sic] agency." Aplt. App. 875. VTC did not take VAIL out of the ski resort services context; instead, they emphasized that context with their choice of mark.

The district court erred by deeming the mark weak simply because Vail is also a geographic location. That a mark is geographically descriptive is "not conclusive of 'strength' . . . since the issue ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source. Thus, a descriptive mark through vigorous promotion can become a strong mark." Restatement § 21 cmt. I. Vail Associates has created a strong mark for skiing resort services. Because of those efforts, the word "Vail" conjures a mental association with those services in buyers' minds. And the record shows that Vail Associates vigorously promotes the trademark and vigorously protects it when used in connection with skiing in Vail. The mere fact

[10](...continued)
mark because in print advertisements the word "Vail" is usually accompanied by a stylized logo. But VTC presented their mark as a phone number, in defendant Hanson's words, a "conduit" for contacting a service by telephone. A consumer would not expect to encounter a stylized logo in the presentation of a telephone number.

that Vail is also a geographical location does not prevent Vail Associates from creating a strong mark when "Vail" is associated with skiing.

As further indication that the VAIL mark is not merely descriptive, VTC does not simply use the word "Vail" as a descriptive term—they are using it to lure customers based on the reputation of the Vail Resort for skiing. VTC juxtaposes the words "ski" and "Vail" in their alphanumeric number to suggest ski resort services, which they provide in competition with Vail Associates. This use of the name "Vail" is quite distinct from the many businesses in the Vail area that incorporate Vail as a geographical location in their business name.[11]

Finally, that Vail Associates' mark has become incontestable—by virtue of its registration for over five years—is further indication of its strength. The parties concede and the district court found that Vail Associates' word trademark became incontestable under 15 U.S.C. § 1065 in 1995. "An 'incontestable' mark

---

[11] The record also shows that Vail Associates does not contest the geographically descriptive uses of the word Vail in numerous local businesses, such as "Vail Limo," Aplt. App. 695, "Vail Daily," Aplt. App. 690, "Vail Valley Music Festival," Aplt. App. 691, and "Vail Golf Club," Aplt. App. 698. This belies the district court's fear that "[t]o grant the protections claimed by the plaintiffs in this case would create a monopolistic empire requiring that anyone who offers any type of service to connect the public with recreation activities in the Vail Valley must first seek a license or permission from the plaintiffs before they can proceed." Aplt. App. 447. The strength of the VAIL mark lies in ski resort services, and 1-800-SKI-VAIL creates consumer confusion only because it suggests a means of accessing those services for which Vail Associates has promoted its mark rather than the geographical location of a particular business. Contrary to the district court's suggestion, the record does not show that the VAIL mark has been asserted in an overbroad or overreaching manner.

-24-

cannot be challenged as lacking secondary meaning; such marks are conclusively presumed to be nondescriptive or to have acquired secondary meaning." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 924 (1986); *see also Dieter*, 880 F.2d at 329 (holding that an incontestable mark "is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark").

Although Vail Associates presented evidence of secondary meaning and need not rely on such a presumption, the incontestability of the VAIL mark only adds to the weight of this factor in its favor. The district court's cursory conclusion that Vail Associates' mark was weak was clear error based on the evidence.

\* \* \*

In sum, the totality of the factors strongly confirms that VTC's mark is likely to cause consumer confusion. Accordingly, I would conclude the district court erred in finding that VTC's vanity number does not infringe upon the Vail Associates' trademark. Because the district court's conclusions with regard to the Trademark Cancellation and False Designation of Origin claims both depended on its finding of no likelihood of confusion, I would remand those claims for further consideration.

I therefore dissent.